# WILLIAMS *v.* CONGER.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

No. 105.    Argued December 16, 19, 20, 1887. — Decided April 2, 1888.

If the removal of a public record from its place of deposit is not prohibited by reason of public policy, it constitutes, when legitimately removed, the best evidence of its contents and of its authenticity.

An original muniment of title produced from the public archives in which it is required by law to be deposited, certified by the public officer who has custody of it, and identified by him as a witness, is sufficiently authenticated to authorize it to be offered in evidence.

A charge in an action to try title to real estate which instructed the jury that if they believe that a paper offered in evidence containing a signature of a party under whom both parties' claim was as old as its date imported, and that it had been preserved in the public archives as the initial paper in the grant, they might give to these circumstances the weight of direct testimony to the genuineness of the signature, and if the other proof did not in their judgment overbear its weight, might find the signature to be proved, neither takes from the jury the determination of the weight of evidence, nor submits to it a question that should be decided by the court.

Papers not otherwise competent cannot be introduced in evidence for the mere purpose of enabling a jury to institute a comparison of handwriting; but where other writings, admitted or proved to be genuine, are properly in evidence for other purposes, the handwriting of such instruments may be compared by the jury with that of the instrument or signature in question, and its genuineness inferred from such comparison.

When the plaintiff and the defendant both claim title under the same original application, and one introduces it in evidence and establishes its identity, the other is estopped from denying the genuineness of the signature to it of the party under whom both claim.

One claiming under a deed forty years old, through several mense conveyances, may offer the deed in evidence as an ancient deed, though never seen by any but the first grantee to whom it was given.

A power of attorney authorized the donee to take possession of real estate by himself or by a person in his confidence, to cultivate it, to sell it, to exchange it or to alienate it. He indorsed it to A by a writing stating: " I transfer all my powers in favor of A, in order that in my name and as my attorney he may take possession," &c. *Held*, that the indorsement only gave A power to take possession, but no power to sell.

A cause was tried before a jury in a state court, and being taken to the highest court of the State that court ordered a new trial, deciding that a

certain document was admissible in evidence as an ancient deed. After the cause was remanded to the trial court it was removed to the Circuit Court of the United States. *Held*, that its decision on that question was binding on the courts of the United States.

In the courts of the United States it is competent for the court to give to the jury its opinion upon the weight of evidence, leaving the jury to determine upon the testimony.

In Texas in the year 1833, a power of attorney to take possession of and convey real estate which was not acknowledged, witnessed, certified to, written on sealed paper, nor proved before a notary was nevertheless a valid instrument, those formalities merely affecting the mode of authenticating it.

The English rule as to the requisites of a power to execute sealed instruments was not in force in Texas when the transactions here in controversy took place.

A copy made in 1837 of a lost certified copy of a power of attorney is admissible in evidence to show that the original power, found and produced in court, was an ancient instrument.

A recital in an ancient power of attorney that the donor is a citizen raises a presumption of the truth of that fact which can be overthrown only by positive proof.

TRESPASS to try title. Judgment for defendants and judgment on the verdict. Plaintiff sued out this writ of error. The case is stated in the opinion of the court.

*Mr. Eugene Williams* for plaintiff in error.

*Mr. E. H. Graham* for defendants in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is an action of trespass to try title, brought by the appellant to recover from the appellees the possession of eleven leagues of land, situated in McLennan and Bosque counties, in Texas, on the west bank of the river Brazos, and granted by the government of Coahuila and Texas in December, 1828, to one Miguel Rabago. The defendants pleaded not guilty, the statute of limitations and laches. The action was commenced on the 11th of September, 1873, in the District Court of McLennan County, Texas, and was tried in that court in the year 1876, and a verdict was rendered and judgment given for the defendants. The case was then appealed

to the Supreme Court of Texas, and at the Austin Term of 1878 the judgment was reversed for an error in the charge on the question of laches, and the cause was remanded for a new trial. 49 Texas, 582. It was then removed to the Circuit Court of the United States for the Northern District of Texas, and was tried in that court in April Term, 1884. Both parties claim title under Rabago; the plaintiff, by derivation from his heirs at law (he having died in 1848), and the defendants through an alleged conveyance made by Rabago, in his lifetime, by an attorney in fact, one Victor Blanco. No question is made, therefore, as to the validity of Rabago's title. The principal controversy at the trial arose in relation to the admission in evidence of two papers offered by the defendants, namely, first, the protocol, or first original, of the application of Rabago for the grant, and of the concession made thereon, produced from the archives in the office of the Secretary of State of Coahuila at Saltillo; secondly, the alleged original power of attorney from Rabago to Blanco, by virtue of which the latter executed a conveyance of the land in the name of Rabago, under which the defendants claim title. The latter was admitted as an ancient document in case of insufficient proof of Rabago's signature, but the jury were permitted to compare the signature with that purporting to be Rabago's affixed to the protocol of the application for the grant. Several bills of exception were taken by the plaintiff to the rulings and charge of the court, a verdict was rendered for the defendants, and judgment was entered thereon, to reverse which the present writ of error was brought.

The following are copies of the documents referred to. The translation of the alleged protocol of Rabago's application, and of the concession made thereon, is in the words following, to wit:

" [Seal of Coahuila and Texas.]

" Petition of Don Miguel Rabago for the purchase of eleven leagues of land in the department of Bexar. December 1st, 1828.

" 3d seal. Two reals. Issued by the State of Coahuila and Texas for the years 1828 and 1829.

" Most Excellent Sir : The citizen Miguel Rabago, resident of the valley of Santa Rosa, with due respect represents to you that needing land for agricultural and raising of stock, he begs you that, by virtue of your authority, you will be pleased to sell him eleven leagues of land on the margins of the Trinity river, in the department of Bexar, or in the section which shall appear to me to be most convenient and best adapted to my interests, being all together or in different localities, offering to settle and cultivate said lands within the time prescribed by the colonization laws of the state of the 24th of March, 1825. Also, that you will be pleased to grant me the time designated by the said law to pay the dues on the said land. I ask your excellency that you will be pleased to refer my petition, for which I will be thankful.

" Leona Vicario, 28th of November, 1828.

"                        (Signed)                 MIGUEL RABAGO."

"Leona Vicario, 2d of Dec'r, 1828.

" Conformable to article 24 of the colonization laws of the 24th of March, 1825, I sell to the petitioner the eleven leagues of land he asks for of the vacant lands in the department of Texas, in the part he may point out, or in the locality most suitable to him. The commissioner whom the government will appoint will place him in possession of said leagues, and will extend the necessary titles, previously classifying the class and quality of said lands as a guide of the amount to be paid to satisfy the government dues, for which payment I grant him the time designated by the 22d article of said colonization law. A copy of the petition and decree will be given to the party intended, for his observance and the subsequent effects.

"              (Signed)                 VIESCA,

SANTIAGO DEL VALLE."

This protocol or second original was authenticated by a certificate annexed thereto, by the Secretary of State of Coahuila, the translation of which is in the words following, to wit:

" The citizen, Licentiate José Ma. Musquiz, Secretary of the Government of Coahuila de Zaragoza, certifies that the annexed document is the original which exists in the archives of the Government of Coahuila relative to the concession of eleven [leagues] of land made to Don Miguel Rabago, in the department of Bexar, on the 2d of December, 1828. And at the request of the applicant this document is given, with the obligation of returning it when the suit in which it is to be used shall be terminated.

" Saltillo, April 6th, 1881.

" [SEAL.]         (Signed)         José Ma. Musquiz, *Sect'y.*"

The translation of the alleged original power of attorney from Rabago to Blanco is in the words following, to wit:

" Monclova, 8*th June,* 1832.

" Señor Don Victor Blanco :

" My esteemed Uncle and Sir : With this I hand you the testimonio of eleven leagues of land which his Excellency the Governor of the State granted to me a sale of, in the department of Texas, in order that you may have the goodness to do whatever should be in your power, so that possession may be taken of them by yourself or by a person of your confidence, giving to you the most ample power so that you may cultivate them, may sell them, may exchange or alienate to your entire satisfaction, because for everything I authorize you, and I will stand and I will pass in all time for that which you should do; and should this my letter power not be sufficient, I will grant judicially as soon as you please, and notify me that you require it and you excusing this trouble. I place myself at your disposal as your most affectionate nephew and servant, who attentively kisses your hands.

" (Signed)         Miguel Rabago (rubric)."

(Indorsement.)

"I transfer all my powers in favor of Señor Don Samuel Williams, postmaster of the town of San Felipe de Austin, in order that in my name and as my attorney he may take possession of the eleven leagues expressed in this.

"(Signed)            VICTOR BLANCO (rubric).
"Monclova, 3d April, 1833."

It appeared on the trial that the extension of final title to Rabago was made on the 13th of January, 1834, on the application of Samuel M. Williams, as attorney for Rabago; but no power of attorney authorizing him to make the application was produced or proved by the plaintiff, whose title depended on the extension thus obtained. The paper above copied, however, purporting to be a power of attorney from Rabago to Blanco, and propounded by the defendants, if their witnesses were to be believed, was found among the old papers of Williams in the custody of his son, and had on it an indorsement by Blanco transferring to Williams all the powers conferred upon him so far as to enable him (Williams) to take possession of the eleven leagues of land.

The defendants claimed that after the title was thus extended, to wit, on the 25th of May, 1836, Victor Blanco, under and by virtue of the power of attorney referred to, sold the land in question, in the city of Mexico, to one Guillermo Laguerenne by an act of sale passed before one Bonilla, a notary public; and that Laguerenne, on the 10th of January, 1837, in the city of Mexico, executed before one Madriago, a notary public, a power of attorney to Francisco Priolland, of New Orleans, authorizing him to sell all and any real estate belonging to Laguerenne, and that the latter, in pursuance of said power, did sell the said eleven leagues on the 15th of February, 1837, to one George L. Hammekin, by act of sale passed before one Caire, a notary public of New Orleans. It was admitted that the defendants had a regular chain of title from Hammekin.

The course of the trial was as follows: The plaintiff first gave in evidence a duly certified translation of the title of

Rabago, from the records of the general land office of Texas, consisting of —

1. A testimonio of Rabago's application for the grant, dated November 28th, 1828; and of the concession made thereon, dated December 2d, 1828.

[The above testimonio was dated December 2d, 1828, and signed by the Government Secretary.]

2. The extension of title, comprising the application for extension by S. M. Williams, as attorney of Rabago, dated December 3d, 1833; the approval of the empresarios (of whom Williams was one); the order of survey; the field notes of the survey, &c.; concluding with a formal patent. This expediente was indorsed as filed in the Land Office June 7th, 1875.

The plaintiff then proved the death of Rabago, and deduction of title from Rabago's heirs to himself, and rested.

The defendants preparatory to offering their documentary evidence of title, including, amongst other things, 1st, the said protocol, or first original of Rabago's application for the grant, with his signature thereto, and the original concession made to him thereon; 2d, the original power of attorney, above mentioned, from Rabago to Blanco; 3d, the act of sale from Rabago, by his attorney Blanco, to Laguerenne; 4th, Laguerenne's power to Priolland; 5th, Priolland's act of sale to Hammekin; — submitted the following evidence, to wit: The depositions taken at Saltillo, Mexico, in August, 1881, of José M. Musquiz, Secretary of State of Coahuila, and *ex officio* custodian of the archives relating to land grants in Texas; and of Estaban Portilla, keeper in charge of said archives, who identified the paper produced by the defendants purporting to be such protocol, or first original, of Rabago's application, found (as they testify) among the said archives in the proper office in Saltillo, and which by the law of the state might be allowed to go out of the office by the permission of the governor. Also, the depositions of Ex-Governor E. M. Pease, of Austin, Texas, and of Andrew Neill, a notary public of the same place, who testified that they were familiar with the signatures of Viesca and Del Valle by having often seen

them as affixed to the public archives, laws and records of
Coahuila and Texas, deposited in the public offices of the
State of Texas, and believed their signatures to the purported
original concession, attached to said application, to be their
genuine handwriting. The defendants also gave in evidence
the testimony of John Willett, to the effect that he procured
the said protocol in Saltillo, for the use of the counsel of the
defendants, by the courtesy of the governor of Coahuila, and
of the secretary, Musquiz, upon giving his bonds for its return.
It was also in evidence that Rabago was in Saltillo (which is
the same as Leona Vicario) in person when the original con-
cession was granted, and brought the testimonio home with
him, and the interpreter testified that the application and
concession in the certified copy put in evidence by the plain-
tiff is a good translation of the document produced by the
defendants.

The defendants then gave in evidence the testimony of
William H. Williams, son of Samuel M. Williams, born in
1833, and of M. E. Klieberg, of Galveston, tending to prove
that the said paper, purporting to be the original power of
attorney from Rabago to Blanco, of which a copy has been
given, was found in 1876 by said Klieberg after a search
therefor at the request of said William H. Williams in behalf
of General Thomas Harrison, one of the defendants, in an old
leather trunk that had belonged to said Samuel M. Williams,
of whose papers said William H. Williams was custodian, and
which trunk contained old miscellaneous papers of said Samuel
relating to occurrences before the year 1836, and had always
been in said William's possession since his father's death in
1858; that the paper in question was an old looking paper;
that the trunk contained several letters and documents signed
by Victor Blanco; and that said paper, with said letters and
documents, were delivered to General Harrison.

The defendants also gave in evidence the testimony of
George L. Hammekin, taken before a notary in November,
1876, who stated that he purchased the land in controversy
about forty years before, in the city of New Orleans, from
Francisco Priolland, acting as attorney for Guillérmo La

guerenne; and had in his possession for a long time a paper purporting to be a copy of a power of attorney from Miguel Rabago to Victor Blanco, and had it then (whilst testifying). That it was dated Monclova, 8th June, 1832; first saw it in 1837 or 1838; that Laguerenne was a Frenchman or an American; that the land was sold to him May 25th, 1836, and by him to witness in February, 1837. [The copy referred to by the witness was annexed to his deposition, and exactly corresponded with the paper propounded by the defendants as the original. It had annexed to it a certificate, of which the following is a translation, to wit:]

" I, the undersigned notary, do certify that the foregoing copy is, to the letter, the same as the original power that Don Victor Blanco has presented to me, and the same that I had before me when making out the bill of sale, that on the 25th day of May, 1836, made by virtue of it to Don Guillérmo Laguerenne of eleven sitios of land situated in the department of Texas, on the west side of the Brazos River, above the road that leads from the town of Nacogdoches to Bejar, as it appears in the public records in my charge. And so that this be of value wherever required, and at the request of the party interested, I issue duplicates of the present in Mexico, the 17th day of March, 1837, being witnesses Dn. Rafael de Revilla, Dn. Teofilo Carreno, and Dn. Felipe de Revilla Olivares, of this community.

"(Signed)   MIGUEL DIEZ DE BONILLA,
" *Notary Public.*"

The defendants also gave in evidence the further testimony of said Hammekin, taken by deposition on the 26th of March, 1880, wherein he says: " I have had the following title papers of the Rabago grant in my possession: 1st. Testimonio, or second original issued in name of Miguel Rabago. 2. A letter of attorney from Miguel Rabago to Victor Blanco. 3. Sale by Victor Blanco as attorney for said Rabago to said Laguerenne. 4. Power of attorney from said Laguerenne to Francis Priolland. 5. Sale by said Priolland to myself.

"I received the above-entitled papers from Francis Priolland in New Orleans at the time I made the purchase. I delivered them to my agent, Robert Rose, and have not seen them since. I saw to-day the original power of attorney from Rabago to Blanco. I have seen Blanco's signature frequently before and after I left Mexico. I know Victor Blanco's signature because I have seen it on many papers having no reference to the Rabago grant. It appears on the said original power of attorney, subscribed to the transfer made to Samuel May Williams. I believe the transfer is in Blanco's handwriting, and I know the signature is his. I had a copy of said power certified before and by Mig'l Diez de Bonilla in the city of Mexico. I also had a copy of this copy." The witness stated that this last copy was delivered by him to General Harrison; and that the original testimonio of title was deposited by him in the general land office at Houston in 1873. [These papers were offered in evidence by the defendants, the said copy of the power being shown to be an exact copy or counterfeit of the purported original power.] The witness further stated that he and his vendees had exercised acts of ownership on this eleven league grant and claimed it certainly since May, 1838; and stated the manner in which such acts of ownership had been exercised.

Hammekin further testified, in another deposition, that the original act of sale from Rabago by Victor Blanco to Laguerenne, dated May 25th, 1836, which was given to the witness by Priolland when he purchased the land in 1837, was executed before Miguel Diez de Bonilla, a notary public in the city of Mexico; that he knew the signature of said officer, and recognized his signature to said act of sale as his genuine signature, because he had often employed Bonilla during his (witness's) residence in Mexico from 1831 to 1836; that he delivered it to Robert Rose, his attorney and agent, in 1850, and had not seen it since. He also stated that he had, then, in his possession, 1st, a legal copy of the original testimonio of title to Rabago, followed by a petition to Judge Alltors by Guillérmo Laguerenne for the same, and a certificate signed by Miguel Diez de Bonilla, and the certificate of the Ameri-

can consul; 2d, a simple copy of the sale from Rabago by Blanco to Laguerenne, followed by a copy of the receipt of the treasurer of the custom house of Mexico, for the alcabala from said Laguerenne. These papers were attached to the deposition. The certificates are dated in the year 1836. To show the loss of the paper given by Hammekin to his agent, Robert Rose, the defendants produced as a witness John N. Rose, who testified that Robert Rose was his brother, was a lawyer, and died in Washington city in May, 1871, and that he (John) was Robert's administrator, and had charge of all his papers, and had several times searched for, and failed to find, the following papers, viz.: 1st, the deed from Rabago, by his attorney Blanco, to Laguerenne; 2d, the power of attorney from Rabago to Blanco, dated the 8th of June, 1832; 3d, the power of attorney from Laguerenne to Priolland, executed in Mexico, January 10th, 1837.

The defendants also gave in evidence the testimony of several witnesses, tending to prove that they and those from whom they derived title had constantly exercised acts of ownership over the land in question from the time of the origin of their title, by paying the taxes, filing the muniments of title, surveying the tract into parcels, selling to settlers, leasing to tenants, compromising with persons who got unauthorized possession of portions of the land, etc., and that, by these means, the tract had become largely settled, and many valuable improvements had been erected thereon.

E. D. Conger testified on the stand: That he is one of the defendants in this case, and was one of the purchasers from Gen. Harrison; that before they purchased they had the title examined by competent attorneys, and bought on the faith of their opinion as to the title; that they never heard of any adverse claim until the institution of this suit; that the land bought by the Congers was the remnant of the grant after the best parts of it had been sold off; that they have paid taxes on the land regularly since they have purchased it; that there were about one hundred settlements on the eleven leagues when they purchased, but none on the part they purchased.

The defendants also introduced in evidence:

1st. A certificate from the comptroller of the State, show-ing that Robert Rose as agent for G. L. Hammekin, rendered for taxes for the years 1854 to 1859, both inclusive, 48,700 acres of the M. Rabago grant in McLennan County, and that the records do not show that there were any other assessments made for those years.

2d. An original lease from A. M. Hughes to William Gra-ham to the Neville league on said grant, dated May 24th, 1854. It recites that Hughes is acting for Robert Rose, the agent for Mr. Goodrich, who claims the Rabago eleven leagues of land. Also, a transfer from said Graham to David E. London of this lease, dated October 17th, 1854.

3d. A power of attorney from George L. Hammekin to Robert Rose, dated May 24th, 1855, recorded in the records of McLennan County, April 28th, 1857. It is a general power to prosecute, sue for, recover, and establish his claim to lands situated in different parts of Texas. To compromise with settlers, and sell.

4th. Docket of the District Court of McLennan County, showing the suits about the land before the war, styled *Ham-mekin* v. *Graham* and *Hammekin* v. *Bell*.

The original act of sale from Rabago, by Blanco, to Lague-renne, purchased by the defendants as after mentioned, recites that the sale was made under a "letter power," which the officer saw, read, and returned to the party, Blanco. It was in evidence that Rabago was a citizen of the State of Coahuila, and that he and his family lived there all their lives. The original testimonio of the title, dated January 13th, 1834, which Hammekin testified was delivered to him by Priolland when he bought in 1837, was also put in evidence by the defendants.

Other evidence referred to in the charge of the court need not be adverted to here.

After the introduction of the foregoing evidence, the defend-ants offered in evidence, as a part of their title, the said pro-tocol, or first original of Rabago's application for the said eleven league grant, and of the concession made thereon, dated, respectively, the 28th of November and the 2d of

December, 1828. The plaintiff objected to its admission on the following grounds :

1st. That it is irrelevant and forms no part of the defendants' title.

2d. The paper, if genuine, is an archive of a foreign government, and from public policy cannot be introduced in our courts, but only a lawfully certified and examined copy can be introduced.

3d. The custodian shows that he holds it by virtue of a foreign law which is not properly proven.

4th. But if the paper be admitted, then it is objected to for purposes of comparison of handwriting, for which object alone it is introduced. Because —

First. It is not such a paper as was required to be signed by Rabago, and no presumption can arise that it was so signed by reason of its being an archive or ancient document.

Second. There is no evidence of the handwriting being that of Rabago.

Third. It is not admitted nor proven to be the genuine handwriting of Rabago.

Fourth. The instrument with which it is to be compared is not so old but that living witnesses to the questioned signature can be and are actually introduced.

The court overruled these objections and permitted the paper to go to the jury for all purposes, subject to be controlled by his charge as to its being a standard of comparison for the handwriting of Miguel Rabago. To this ruling the plaintiff excepted.

The plaintiff then offered evidence to rebut that adduced by the defendants, as to the genuineness of the alleged protocol, to wit: the testimony of Antonio Garcia Corillo and Ramon L. Flores, the purport of which was, that Flores, then chief clerk of the Department of State, at the request of Corillo, had searched the archives in 1874 for everything relating to the Rabago grant, and had not found the document now produced by the defendants. The court still adhered to its ruling to admit the document in evidence.

This raises the first question in the cause, namely, whether

the protocol, or first original of the application and concession, belonging to the public archives of the State of Coahuila, at Saltillo, is admissible as evidence. The court below decided that it was, and we have difficulty in seeing any reason why it should not be. It is true that the testimonio given out to the interested party is a second original, and is treated as an original, and may be admitted in evidence as such; but it does not take away from the validity and faith of the first original. The latter may always be resorted to for the purpose of correcting any errors in the testimonio. It is true, it may be deemed a matter of public policy in some states to prohibit public records from being removed from their places of deposit; but if their removal is allowed, or in any legitimate way effected, they certainly constitute the best evidence of their contents and authenticity. No public policy could have been contravened, in the present case, but that of the State of Coahuila, or the Republic of Mexico. If the authorities of Coahuila allowed the removal of the protocol in question, we do not see what objection could be made by the courts of Texas, or of the United States. On general grounds, there is no valid objection to its admissibility. Though by the practice of the courts a certified or sworn copy of a record of another court may suffice it is not unusual for the record itself to be brought in. In Taylor on Evidence, § 1377, it is said: "The general records of the realm, which are placed under the custody of the Master of the Rolls, may be proved by copies purporting to be verified by the deputy-keeper of the records, or one of the assistant record-keepers, and to be sealed and stamped with the seal of the record office; and in cases of importance before the House of Lords or elsewhere, permission will be given to one of the assistant keepers to produce the original record." In § 1378, it is also said: "The records of the superior courts may either be proved by the mere production of the originals, or, — as this course would be highly inconvenient to the public if generally adopted, since it might lead to mutilation or loss of valuable documents, — they may be proved by means of *copies*. Of these, there are four kinds; viz., exemplifications under the Great Seal; exemplifi-

cations under the seal of the particular court where the record remains; office copies; and examined copies." This shows that originals are admissible as evidence, if properly authenticated. We do not see how it could well be more satisfactorily authenticated than it was, namely, by the certificate annexed to it by the Secretary of State of Coahuila, and by the actual identification of it, made by the said secretary and his keeper of records when examined as witnesses in the cause. The objection that it was irrelevant is certainly untenable. It was one of the links in the defendants' chain of title. They were not bound to rest on the *testimonio* of the same document introduced in evidence by the plaintiff, nor on that introduced by themselves. They were entitled, if they chose, to put in the very original itself, even if it were cumulative evidence. As to the uses to which it might be applied, being admissible as evidence, it might go before the jury, and be used, under the charge of the court, for all legitimate purposes in the cause. It was certainly available as a link in the defendants' chain of title, if for nothing more.

The defendants contended that the signature purporting to be that of Rabago, appended to the application, might be examined by the jury as a standard of comparison of Rabago's handwriting, on the question whether the signature purporting to be his on the other paper, namely, the power of attorney from Rabago to Victor Blanco, was genuine or not. This was resisted by the plaintiff on the grounds stated above; and, before the cause went to the jury, the plaintiff requested the court to charge that, at the date of the signature to the application, the law did not require it to be signed by Rabago; and that it should only be considered as one of the links in the chain of defendants' title, and not for the purpose of comparison of handwriting; and that the jury should not consider such signature as the signature of Rabago for that purpose. The court refused to give this instruction, and the plaintiff excepted; and the court then charged the jury on this point as follows, to wit:

"The defendants have also offered a paper which purports to be the original application of Miguel Rabago for this conces-

sion. which purports to be signed by said Rabago in person —
that is, by himself, and have offered proof to the effect that this
paper came from the office of the archives at Saltillo, which
is the proper custody for said original application and decree,
and to the effect that the signatures of Governor Viesca and
of the secretary are genuine, with proof as to the circumstan-
ces of the finding said paper, and manner [of] keeping said
archives, and if you believe from the proof that said paper
so offered by the defendants is as old as its date imports, that
it has been preserved in the archives as the initial paper con-
nected with this grant, you may give these circumstances the
weight of direct testimony to the genuineness of said signa-
ture, and if the other proof in the case does not in your judg-
ment overbear this weight you may find the signature to this
original application to be the proved signature of Miguel Ra-
bago, and use it as a standard of comparison to aid you in
determining the genuineness of the signature to the writing
purporting to be a letter power from said Rabago to Victor
Blanco."

To which charge of the court the plaintiff's counsel objected
and excepted for the following reasons :

1st. The charge is upon the weight of evidence.

2d. It submits to the jury a question which should be de-
cided by the court.

3d. It submits to the jury a paper for the comparison of
handwriting which is neither proven nor admitted to be genu-
ine, nor to be signed by the genuine signature of Miguel
Rabago.

The first and second reasons are certainly not well assigned.
The charge does not take from the jury the determination of
the weight of the evidence ; nor does it submit to the jury a
question of law determinable only by the court. Whether
the signature appended to the application, purporting to be
Rabago's, if the jury believed it to be his, might legally be
used by them as a standard of comparison to aid them in de-
termining the genuineness of the signature to the writing pur-
porting to be a letter power from Rabago to Blanco, is the
important question arising upon the charge.

It is well settled that a witness who only knows a person's handwriting from seeing it in papers produced on the trial, and proved or admitted to be his, will not be allowed, from such knowledge, to testify to that person's handwriting, unless the witness be an expert, and the writing in question is of such antiquity that witnesses acquainted with the person's handwriting cannot be had. (Greenl. on Ev. § 578.) It is also the result of the weight of authority that papers cannot be introduced in a cause for the mere purpose of enabling the jury to institute a comparison of handwriting, said papers not being competent for any other purpose. (Greenl. on Ev. §§ 579, 581.) But where other writings, admitted or proved to be genuine, are properly in evidence for other purposes, the handwriting of such instruments may be compared by the jury with that of the instrument or signature in question, and its genuineness inferred from such comparison. *Griffith* v. *Williams*, 1 Crompton & Jervis, 47; *Doe dem. Perry* v. *Newton*, 5 Ad. & El. 514; *Van Wyck* v. *McIntosh*, 4 Kernan (14 N. Y.) 439; *Miles* v. *Loomis*, 75 N. Y. 288; *Medway* v. *United States*, 6 Ct. Cl. 421; *McAllister* v. *McAllister*, 7 B. Mon. 269; 1 Phil. on Ev. 4th Am. Ed. 615; Greenl. Ev. § 578. The history of this last rule is well stated in *Medway* v. *United States, qua supra*. In *Griffith* v. *Williams* it was stated by the court that "where two documents are in evidence, it is competent for the court or jury to compare them. The rule as to the comparison of handwriting applies to witnesses who can only compare a writing to which they are examined with the character of the handwriting impressed upon their own minds; but that rule does not apply to the court or jury, who may compare the two documents when they are properly in evidence." In *Doe* v. *Newton*, Lord Denman said: "There being two documents in question in the cause, one of which is known to be in the handwriting of a party, the other alleged, but denied to be so, no human power can prevent the jury from comparing them with a view to the question of genuineness; and therefore it is best for the court to enter with the jury into that inquiry, and to do the best it can under circumstances which cannot be helped." The other judges expressed

substantially the same view. " The true rule on this subject," said Justice Johnson, in *Van Wyck* v. *McIntosh*, (4 Kernan 439, 442,) " is that laid down in *Doe* v. *Newton*, that where different instruments are properly in evidence for other purposes, the handwriting of such instruments may be compared by the jury, and the genuineness or simulation of the handwriting in question be inferred from such comparison. But other instruments or signatures cannot be introduced for that purpose." See Amer. note to *Griffith* v. *Williams*, 1 Cr. & Jerv. 47, Phil. Ed.

This rule is not contravened by the decisions of the Supreme Court of Texas or of this court. The leading case in Texas on comparison of handwriting is *Hanley* v. *Gandy*, 28 Texas, 211, which only decides that other papers, not connected with the cause, cannot be introduced for the mere purpose of instituting a comparison of handwriting. No case decides that a signature to be proven cannot be compared by the jury with other papers or signatures of the party, properly in evidence in the cause. *Strother* v. *Lucas*, 6 Pet. 763, the leading case in this court, relates to the competency of a witness to testify as to the genuineness of a signature without having any knowledge of the party's handwriting; and the court held that such evidence was not admissible. The case of *Moore* v. *The United States*, 91 U. S. 270, affirms the rule in question in cases where the paper used as a standard of comparison is admitted to be in the handwriting of the party, or where he is estopped from denying it to be so; it does not disaffirm the rule as applied to cases where the standard is clearly proved to be in such handwriting. In that case the paper referred to as the standard of comparison was the claimant's power of attorney given to his attorney in fact, by virtue of which the latter presented his case to the Court of Claims. It was held that he was estopped from denying that the signature to the power was in his handwriting. The present case is quite similar to that. The plaintiff himself claims title under the very application of Rabago, the signature to which is claimed to be a proper standard of comparison of Rabago's handwriting. Is he not estopped from denying it to be Rabago's hand? His counsel say that

at that period of time the application did not require the party's signature. Even if this be so, still it is proved that Rabago was at Saltillo at the time the application was made, and it purports to be signed by him, and not by any person for him; and, if the document is the real protocol of the application as presented, it is to be presumed, at least until the contrary is shown, that the signature which it bears is the real signature of Rabago. Whether the document is or is not the real protocol of the application as presented, was fairly left to the jury under the circumstances and evidence of the case — which, we may add, were so strong and convincing that the jury would not have been justified in finding in the negative. The evidence, indeed, was such as abundantly to satisfy the condition, that the paper referred to as a standard of comparison must be clearly proved to be genuine. We think that the charge of the court was right.

The defendants next offered in evidence, as an ancient instrument, the alleged original power of attorney from Rabago to Victor Blanco, found by the witness Klieberg in the old trunk, at Galveston, a copy of which, with the indorsements thereon, has been already given. The plaintiff objected to its admission for the following reasons, to wit:

First. Having been in the trunk since March, 1836, it could not have been the instrument by virtue of which title passed from Rabago in the city of Mexico, by deed from Blanco to Laguerenne on the 25th of May, 1836.

Second. The recitals in the deed contradict the evidence of Williams and Klieberg, under whose testimony it is introduced.

Third. It cannot be introduced as an ancient instrument, because, —

1st. No possession was ever held under it, it not coming to the possession of the defendants for forty years after its execution.

2d. It is suspicious on its face by reason of not being acknowledged, certified to, witnessed, nor written on sealed paper.

3d. It does not come from the proper custody.

Fourth. It is not such an instrument as would have passed title to land in 1832 or in 1836.

1st. It is not acknowledged, witnessed, certified to, nor written on sealed paper.

2d. No summons was served upon the grantor to appear before an official for the purpose of rendering it an authentic or judicial act.

Fifth. The power to Blanco, if any, could not pass an equitable title, if any, which could not be cognizable in a court of law.

Sixth. It is not made part of the Laguerenne deed.

Seventh. If it conveyed any power, it was divested out of and from Blanco by the indorsement and delivery to Samuel May Williams in 1833.

Eighth. It appears to have been executed, if at all, before six years from the issuance of the concession, and does not bind the attorney nor his vendees to cultivate the land.

Ninth. If genuine, it was revoked by the war of 1835, the revolution between Texas and Mexico, and the constitution of March 17th, 1836.

Tenth. It cannot act as power to make a parol or verbal sale, because no possession was taken under it within a reasonable time.

These objections were overruled, the paper admitted in evidence, and the plaintiff excepted; this being the fourth exception taken at the trial.

The objections made against the admission of the paper seem to be either entirely unfounded, or trivial in their character. It is not testified by William H. Williams that it had been in the black trunk ever since March, 1836; he could not know such a fact, for he was only born in 1833. He only says that it was probably placed in the trunk by his mother at the time of the "runaway scrape" (which took place on the advance of Santa Anna in March, 1836); that from his mother's statements, she had his father's papers with her at that time, and that she kept them until her death, and the witness has kept them from that time until now; that the trunk was either in his father's or mother's possession, until it came into his; that his earliest recollection of it was in 1840, at their house in Galveston, where it remained until 1859; but that it was tradition-

ally known to witness to have been with the family at San Philipe de Austin and at Quintana, and afterwards at Galveston; that from 1836 to 1838 his father and mother lived at Quintana, at the mouth of the Brazos River.

There is nothing in this testimony inconsistent with the fact that Blanco may have transmitted the paper to Samuel M. Williams after the execution of the deed to Laguerenne in Mexico in May, 1837. As it was Williams's authority for taking possession of the property, and not recited in the final title papers, he may have wished it returned to him.

There is nothing in the recitals of the deed to Laguerenne repugnant to the above hypothesis. That deed (which will be more particularly mentioned hereafter) begins as follows: "Before me, notary public and witnesses, Don Victor Blanco, in name of Don Miguel Rabago, in virtue of letter power which has conferred on him for various purposes, among which is comprised the faculty that he can sell and may sell the lands which he has in Texas, which he showed to me, which I have seen, read, and returned to the party, and to it in his possession I refer, — said: That the aforesaid Don Miguel Rabago possesses," etc. [then proceeding in the usual form of an act of sale]. There is no recital here at all inconsistent with the testimony of Williams or of Klieberg; and, as the notary certifies that the power was exhibited to him, Blanco had no occasion to retain it in his possession. Besides, he was a near relative and friend of Rabago, and did not require it.

The other reasons given for objecting to the admission of the power are equally untenable. It is said that no possession was ever held under it, it not coming into the defendants' possession for forty years after its execution. This is not true. The possession of the defendants and of those whose title they hold was always under and by virtue of the instrument. If property passes through a dozen hands in the course of forty years, each keeping in his own possession the deed given to him, the possession of all is equally under the first deed, which may be given in evidence as an ancient deed, although never seen by any but the first grantee to whom it was given. The

paper is said to be suspicious on its face, for want of acknowledgment, etc., and that no summons was served on the grantor
to appear before an official to render it an authentic or judicial
act.  It is enough to say that none of these things affect the
validity of the instrument; and the circumstances of the case
and of the time are sufficient (if any reason is necessary) to
account for the absence of these formalities.  Besides, they
relate more especially to the effect of the instrument than to
its admissibility as an ancient document; and in that regard
will be examined under the seventh exception, hereafter considered.  We see nothing in the other objections to call for
remark, except the one that supposes the power was divested
out of Blanco by the indorsement and delivery to Samuel M.
Williams.  This is not so.  The indorsement merely gives
Williams power to "take possession of the eleven leagues."
The power to sell was not transferred.  This very fact suggests the reason why the power was returned by Williams to
Blanco after the possessory title had been completed.  Blanco
would want it for the purpose of enabling him to make a
sale.  The more we consider the circumstances, the more clear
it appears that the evidence is entirely harmonious, and consistent with itself.  We think that the paper was properly
admissible as an ancient writing.  It is unnecessary to dilate
on the subject of ancient documents in general, and when
they are admissible.  We are of the opinion that all the conditions of admissibility were satisfied in this case.

But there is another reason why it is proper that we should
so hold.  The case was once before the Supreme Court of
Texas on an appeal taken to set aside the verdict rendered on
a former trial, and that court held, under the same evidence
used at the trial in the Circuit Court, that the document was
admissible in evidence as an ancient one.  If the action had
originally been brought in the Circuit Court upon proper jurisdictional grounds, and had been tried as it was in the state
court, and if, on a writ of error from this court, we had decided as the Supreme Court of Texas did, — we should have
felt bound by our first decision.  We would not have allowed
it to be questioned.  *Clark* v. *Keith*, 106 U. S. 464.  The

present case is in exactly the same category. The removal of the cause from the state court does not put us in the position of a court of review over the Supreme Court of Texas. When it acted, it was the highest court that could act in the cause, and stood in precisely the same position that we stand now. Its action must be accepted by us as that of a court having plenary and final jurisdiction.

By the fifth exception, objection is made to that portion of the judge's charge in which he says : "By the law in force at the time this letter power of attorney purports to have been transferred to Samuel May Williams (April 3d, 1833), authorizing him to solicit title to and take possession of said eleven leagues, and at the time said Blanco made his deed to Laguerenne, Blanco could have procured, if he desired, and retained in his possession a legal copy of the power of attorney, which would have all the force and effect of the original ; and although the original might at the time be in Samuel May Williams's trunk, in Texas, Blanco's conveyance to Laguerenne would not on that account be without authority if the said paper in Williams's trunk was a genuine paper giving him such power. Such power, if conferred, was conferred on the one named, and remained with him, whether evidenced by the original writing or such copy."

It is objected that there is no evidence that any attempt was ever made by Blanco to obtain such a copy ; and that none could have been obtained, because the original had never been an archive of any office. This same objection was before the Supreme Court of Texas. That court seems to have adopted the hypothesis that Williams never returned the power to Blanco, and that the latter, therefore, did not return it to Williams after making use of it in the sale to Laguerenne. The court says : "Where should we have expected to find the instrument ? Certainly we would infer that it should have been placed by the commissioner to whom it was presented either with the papers pertaining to the title which he issued for the land, or have been returned to the party by whom it was presented to him. But as the title shows that it was not incorporated into it, as is most usual when the power is an au-

thentic act, we should expect to find it in the custody of Wil-
liams, in whom the title and possession of it purports on its
face to be vested; or, if not, that he would have transmitted
it to his principal, Blanco. But as the latter appears to have
taken the precaution to have another power of like effect from
Rabago, or to have secured an official copy of this one before
remitting it to Williams, there was no necessity for its being
returned to him." Certainly there is nothing unreasonable or
improbable in the hypothesis that the paper should have been
executed in duplicate, in view of the fact that the possessory
title to the land had yet to be obtained, and some person in
Texas would have to be authorized to attend to it. We think,
therefore, that the judge was justified in making the charge he
did, and that the jury could not have been misled by it. The
fact that Blanco had the original, or a copy, in Mexico on the
25th of May, 1836, does not detract from the force of the pre-
sumptions in favor of the power found in the trunk.

The sixth exception was taken to that portion of the charge
which related to the evidence proper to be taken into consid-
eration on the question of the genuineness of the power of
attorney and its effect. The portion of the charge referred to
is as follows, to wit:

"The defendants introduced testimony tending to show that
as early as 1838 Hammekin had placed in his possession the
deed from Blanco to Laguerenne, referring to such a power of
attorney; that he insisted on having an authenticated copy of
said power furnished him; that very soon thereafter he received
said copy of said power, which he placed (with other title pa-
pers) in the hands of his agent, retaining a copy made by said
Hammekin, which copy has been given you, declared by the
interpreter to be identical (with immaterial exceptions) in terms
with the letter power offered by defendants; that Hammekin
had placed the testimonio in the land office as required by law
of persons having such evidence of title to land in Texas; that
said Hammekin paid the government dues on said grant, had
paid taxes, had sent agents on the land as early as the growing
settlement of the country so far freed this section of the coun-
try from the hostile Indians, as permitted its occupancy, and

the assertion of ownership by assuming actual control of it, and that Hammekin and those to whom he conveyed and the defendants claiming under them had continued to assert ownership to these lands under said power of attorney, and if, in your judgment, said proof establishes such facts, and the proof as to the age and custody of the said letter power satisfies you that said paper is as old as its date imports, and has been in the custody that said evidence indicates; you may consider this proof equal to the direct testimony of at least one witness to the signature of Miguel Rabago; and unless in your judgment the evidence of plaintiff's witnesses and all the circumstances of these parties and these transactions as shown by all the testimony proves that Miguel Rabago did not sign said letter power, you will find said letter power to be genuine, and return your verdict for the defendants."

To this extract from the charge the plaintiff's counsel objected —

1st. Because it is a charge upon the weight of evidence.

2d. It is in itself an incorrect statement of law.

The plaintiff's counsel seem to overlook the language of the charge. The court did not say that such and such facts were proved, but that the defendants introduced testimony tending to show such facts; and left the testimony with the jury. Besides, we have repeatedly held that the court may give to the jury its opinion on the weight of evidence. We see no error whatever in the charge.

The seventh exception was taken to a portion of the charge which instructed the jury that if the papers and documents relied on by the defendants, and constituting their chain of title, were genuine, they conclusively show that Rabago parted with his title in his lifetime, and no right to it could pass to his heirs by descent, and that the defendants by reason of their right thus acquired would be entitled to a verdict. The ground assigned for this exception was that the letter power of attorney was not such an instrument as could convey land in Texas at that time, because it was not an authentic instrument, being neither acknowledged, witnessed, certified to, nor written on sealed paper, nor proved before a notary;

and no summons was even served on Rabago to appear before an official for the purpose of rendering it an authentic or judicial act. We apprehend that the want of the formalities referred to merely affects the mode of authenticating the instrument. If it is passed before a notary public and witnesses, and is certified as a *testimonio*, it is called an authentic instrument and proves itself. If not thus authenticated, it must be proved to have been executed by the party to be charged with it. *Watrous* v. *McGrew*, 16 Texas, 506, 509, 513; *Andrews* v. *Marshall*, 26 Texas, 212; *Jones* v. *Montes*, 15 Texas, 351, 352; *Chambers* v. *Fisk*, 22 Texas, 504; *Gonzales* v. *Ross*, 120 U. S. 605, 624; *Hanrick* v. *Barton*, 16 Wall. 166, 171, 172. The appellant relies upon a passage in Escriche (*verbo* Poder) where he says that a power of attorney is to be made before a notary public, and to have certain formalities described. But he there refers to the technical power called, in the Spanish law, *poder*, or *procuracion*, having much the same meaning as our term "power of attorney," which indicates a power or authority under seal. But the technical *poder* is not the only form by which authority may be given to act for another. A technical power, executed with all the solemnities, is but one form of a mandate (*mandato, mandamiento*). Under the word *mandato*, the same Escriche says: "Mandate. A consensual contract, by which one of the parties confides the carrying on or execution of one or more matters of business to the other who takes it in his charge. . . . Mandate has also the name of procuration, and the mandatary that of procurator; but the word mandate is more general and comprehends every power given to another in whatsoever mode it be, whilst procuration supposes a power given by writing." Again: "The mandate may be contracted between persons present, or absent, by words, by messengers, by public writing or private writing, and even by letter, as likewise by acts; *e.g.*, if a person, being present, allows another to transact his business, &c." See farther to the same effect, Azo and Manuel's Institutes, Book II, Tit. XII; Tapia's Febrero Novisimo, Book II, Tit. IV, c. 13, 14; Partida V, Tit. XII, L. 24.

In the present case the parties were not in the same place; Rabago resided in the State of Coahuila, and Blanco in the city of Mexico; so that the making of the power in the form of a letter was the very form allowed by the laws in such a case. As before said, the only difference it made was in the proof necessary to authenticate the instrument in legal proceedings.

As to the objection that this form was not sufficient to authorize an act of sale, but that it required a power executed under the same solemnities as the act of sale itself, we know of no such rule in the Spanish or Mexican law. The English rule as to the requisites of a power to execute sealed instruments has no application to the case.

The eighth exception related to the admission in evidence of Hammekin's copy of the power of attorney. He testified that when he purchased the land from Laguerenne, through Priolland, the latter had no copy of the power from Rabago to Blanco, and he (Hammekin) made it a condition that a copy should be furnished to him; and that soon after he received a certified copy, which he delivered to his agent, Rose, with the other papers, and with them has been lost. He testified, however, that he took an exact copy of this certified copy before giving the latter to Rose, and had it yet; and it was in evidence in the case and was found to be an exact copy of the power found in the old trunk, with the exception of a date being written in words at length in place of figures, and an abbreviation being written in full words. This copy made by Hammekin himself (called the "Hammekin copy") is the paper whose admission in evidence was objected to. The plain answer to the objection is, that it was not offered nor admitted as a muniment of title, but merely to show the fact that there was such a paper in existence in 1837 as that found in the trunk, which fact had a legitimate bearing on the question whether the latter was an ancient instrument. For this purpose, it was certainly admissible.

The ninth exception related to the admission in evidence of a copy of the deed, or act of sale, executed by Victor Blanco, as attorney for Rabago, to Laguerenne, dated May 25th, 1836;

and of a copy of the power of attorney given by Laguerenne to Priolland to sell his real estate. The copies offered in evidence by the defendants were certified copies. That of the deed of May 25th, 1836, was taken in the city of Mexico from the original protocol of the deed in the notarial archives, or records, of the deceased notary, Miguol Diez de Bonilla, before whom the deed purported to be executed. It appeared by the testimony of one Crescencio Landgrave, a notary public of the city of Mexico, that these archives, with those of other deceased notaries, had been collected and placed in the public archives of the city of Mexico, under the charge of different notaries. Landgrave testified that he had general charge of said archives, and the particular charge of those of Bonilla, whom he knew, and with whom he was intimate; and that he knew Bonilla's signature appended to the different documents in the archives, and, in fact, received them from his own hands in his (Bonilla's) lifetime. He further testified that the protocol of the deed from Rabago, through Blanco, to Laguerenne, was among the archives of Bonilla, and that he, as the custodian thereof, made an official and duly certified copy of said deed (which was the copy offered in evidence); the certificate annexed to the copy being in the words following, to wit:

"I certify and give faith that the preceding copy is faithful and exact to the letter of the original document which exists on folio 37 to folio 40 of the protocol of my deceased companion, Don Miguel Diez de Bonilla, which I have under my custody in the archives of the city which is under my charge, from whence the present was taken in order to deliver it to the consul of the United States of the North, in Mexico, by virtue of judicial mandate, this 15th December, 1874, in presence of Don Miguel Moral and Don Manuel Correo, of this vicinity. (Between Parenthesis:) All not valid.

"[L. S.]            (Signed)            CRESCEN. LANDGRAVE."

The official authority of Landgrave is authenticated by the certificates of three other notaries, of the Governor of the Federal District, of the chief official of the Department of Foreign

Affairs, and of the United States consul, each certifying to the authority of the preceding.

Landgrave further testified that his brother in office, notary public Antonio Ferreira, had charge of the records of the deceased notary Francisco Madriago, before whom the power of attorney from Laguerenne to Priolland, before referred to, purports to have been executed.

A certified copy of this power of attorney, certified by Ferreira, and authenticated in the same manner as the deed to Laguerenne, was the copy offered in evidence by the defendants, the power being dated January 10th, 1837, and its protocol being among the archives of the deceased notary Francisco de Madriago. This power of attorney authorized said Priolland to sell and dispose of all and any real estate belonging to Laguerenne wherever situated.

It is unnecessary to examine in detail the reasons assigned by the plaintiff for objecting to the admission of these papers in evidence. We think that they were properly and sufficiently authenticated, and that the judge committed no error in admitting them.

The only other exception related to the citizenship of Laguerenne. The plaintiff alleged that it was not shown that he was entitled to convey land in Texas in May, 1837, but that he was disabled to do so by reason of his being a citizen of France, and an alien to the government of Texas. The only direct statement as to his citizenship is that contained in the said power of attorney which he executed, and which begins as follows: "In the city of Mexico, on the 10th day of January, 1837, before me [Madriago], a notary public, and witnesses, personally appeared Don Guillermo Laguerenne, a citizen, and of the commerce of this place, in whom I have faith and know," &c. There is no testimony in the case sufficient to overthrow the presumption arising from this recital. Hammekin says that he does not recollect whether he was an American or a Frenchman; that in May, 1836, he was established as a merchant in the city of Mexico; that he had a brother in Philadelphia much older than himself, who was a merchant in that city for many years. This is all the evidence

on the subject. It must be received, therefore, that he was a citizen of Mexico. As to citizens of Mexico, it is well settled that they never lost the right of disposing of their Texas lands by the division of the empire. *Airhart* v. *Masseiu*, 98 U. S. 491, 493, 497.

Having considered all the material questions raised by the plaintiff in error, and being of opinion that he has not succeeded in showing any error in the judgment of the court below, the same is

*Affirmed.*